# Illinois Official Reports

## Appellate Court

---

### *Lane v. Deutsche Bank, AG*, 2015 IL App (1st) 142968

---

| | |
|---|---|
| Appellate Court Caption | R.J. LANE, Plaintiff-Appellant, v. DEUTSCHE BANK, AG, and BDO SEIDMAN, LLP, n/k/a BDO USA, LLP, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-14-2968 |
| Filed | November 4, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-39; the Hon. Eileen O'Neill Burke, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lewis & Roberts, PLLC, of Charlotte, North Carolina (Gary V. Mauney and James A. Roberts III, of counsel), and Law Offices of Michael T. Reagan, of Ottawa (Michael T. Reagan, of counsel), for appellant.<br><br>Taft Stettinius & Hollister LLP, of Chicago (J. Timothy Eaton and Jonathan Amarilio, of counsel), and Duval & Stachenfeld LLP, of New York, New York (Allan N. Taffet and Keith Blackman, of counsel), for appellee Deutsche Bank, AG.<br><br>DLA Piper LLP, of Chicago (Michael S. Poulos, Joseph Collins, Raja Gaddipati, and Pamela Begaj, of counsel), DLA Piper LLP, of Philadelphia, Pennsylvania (Joseph Kernen, of counsel), DLA Piper LLP, of New York, New York (Cary B. Samowitz, of counsel), and DLA Piper LLP, of Baltimore, Maryland (James D. Mathias, of counsel), for appellee BDO USA, LLP. |

| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1 In January 2014, plaintiff R.J. Lane filed a complaint against defendants Deutsche Bank and BDO Seidman (collectively, defendants), among others, alleging fraud, civil conspiracy, and breach of fiduciary duty. These allegations arose from defendants' promotion of an illegitimate tax shelter in which Lane invested in October 2000. Defendants moved to dismiss the complaint on the ground that Lane's claims were time-barred. The circuit court agreed, and Lane appeals. We agree that Lane's claims are time-barred and affirm.

¶ 2                                                        BACKGROUND

¶ 3 Lane is a former president and chief operating officer of a computer software company. In 2000, Lane exercised certain stock options in that company and realized $250 million in ordinary income. In his complaint, Lane alleges that in an effort to "manage and account for that income," he consulted BDO Seidman, his longtime accounting firm. BDO Seidman's Tax Solutions Group helped clients minimize taxes on income by creating structured investment strategies in partnership with Deutsche Bank. One such strategy was known as Partnership Option Portfolio Securities (POPS).

¶ 4 Michael Kerekes, Lane's point of contact at BDO Seidman, allegedly advised Lane that the POPS strategy utilized trades and warrant investments that carried a reasonable probability of profit, but would more than likely result in losses that could be deducted from his income for tax purposes. In support of the legality of this strategy, Kerekes provided Lane with an opinion letter authored by Peter Cinquegrani, an attorney with the Washington, D.C., office of Arnold & Porter. Cinquegrani's letter indicated that POPS met legal standards to produce tax benefits and could withstand a challenge by the federal government. Kerekes advised Lane that Cinquegrani's letter would protect Lane in the event of an IRS investigation and prevent any assessment of penalties because Arnold & Porter was not affiliated with either BDO Seidman or Deutsche Bank.

¶ 5 Based on these representations, Lane elected to participate in the POPS shelter in October 2000. He acquired a 99% interest in Vanadium Partners Fund, LLC, the entity through which the losses would flow, and guaranteed a $250 million loan Deutsche Bank had made to Vanadium. Vanadium and Deutsche Bank went on to execute hundreds of trades, and the losses that resulted were assigned to Lane. Lane also made an initial investment of $18 million, which he was told would go toward warrants for various start-up companies.

¶ 6 Lane, believing in the legitimacy of the tax shelter, then filed a 2000 tax return (prepared by BDO) claiming over $249 million in losses from the POPS transactions. In doing so, he avoided paying taxes on $250 million in income at a 35% rate, resulting in $87.5 million in tax savings. Although he lost his initial $18 million POPS investment, he realized, at least temporarily, a net gain of $69.5 million.

¶ 7 Unbeknownst to Lane, however, defendants had misrepresented many elements of the POPS strategy. First, Arnold & Porter was not acting independently, but was working with

BDO Seidman and Deutsche Bank to promote POPS. Furthermore, Lane's guarantee of the loan to Vanadium was riskless, as Deutsche Bank retained sufficient collateral in the event Vanadium defaulted on the loan, and Lane's $18 million investment went not to start-up companies, but to BDO Seidman, Deutsche Bank, and Arnold & Porter as a fee for arranging the tax shelter. Finally, the POPS transactions, rather than conveying a reasonable probability of profit, were rigged to result in a loss.

¶ 8    The POPS shelter had also come under scrutiny by the IRS at the time Lane elected to participate. On August 11, 2000, the IRS issued Notice 2000-44, which warned that "artificially high basis" transactions were "not allowable for federal income tax purposes" as they lacked economic substance because they did not correspond to actual economic losses. Upon receipt of the notice, Kerekes immediately sent a memorandum to others in BDO Seidman's Tax Services Group in which he concluded that the firm's POPS strategy fell under those disallowed under the notice.

¶ 9    In January 2002, two years after Lane filed his tax return claiming $250 million in losses, the IRS announced an amnesty program for taxpayers who admitted involvement in shelters akin to POPS. Specifically, the IRS offered taxpayers who disclosed their involvement with certain illegal shelters the opportunity to avoid paying penalties for underpayment of taxes. Kerekes provided Lane with a copy of the amnesty announcement, but allegedly downplayed its significance and represented to Lane that the POPS shelter was not among those the IRS found to be illegal. Lane heeded Kerekes's advice not to seek amnesty.

¶ 10    Several months later, in May 2002, the government initiated an action in the United States District Court for the Northern District of Illinois to enforce summonses that were served on BDO Seidman as part of an investigation into whether BDO Seidman promoted illegal tax shelters. During the course of that action, in October 2002, Lane and other BDO Seidman clients intervened anonymously to prevent the disclosure of their identities. The district court ruled against them and held that the identities of BDO Seidman's clients were not privileged. The court further ordered BDO Seidman to notify its clients of the investigation and give them an opportunity to intervene. Lane took advantage of this opportunity in June 2004 and sought to block the disclosure of opinion letters and correspondence he received from BDO Seidman offering tax advice.

¶ 11    Meanwhile, the government moved to order the disclosure of the memorandum Kerekes authored in August 2000 in response to Notice 2000-44. Although the court ultimately ruled in favor of BDO Seidman and found the Kerekes memorandum privileged, the contents of the memorandum were quoted in large part in the government's motion filed in December 2004. Specifically, the government quoted Kerekes as follows: "It seems clear that our transactions are listed transactions under Notice 2000-44. In addition, under the new definition, it seems very probably [sic] that our transactions lack economic substance and/or are tax-structured."

¶ 12    In 2005, the IRS informed Lane that it was auditing Vanadium's 2000 tax return. And in the ensuing years, several of those involved in promoting the POPS shelters pled guilty to criminal charges, beginning with Cinquegrani in September 2008. According to Lane's complaint, Cinquegrani admitted to participating in a conspiracy to defraud the IRS by authoring "bogus" tax opinions and entering "phony" consulting agreements with other tax shelter promoters. Then, in February 2009, Kerekes pled guilty to carrying out illegal shelters, admitting that he prepared fraudulent documents to deceive the IRS about the nature of BDO Seidman's tax shelter strategies. Six months later, Robert Greisman, a partner at BDO

Seidman, pled guilty to the same, acknowledging that he knew the tax shelter transactions had no reasonable profit potential.

¶ 13 On January 31, 2013, the IRS issued a notice of deficiency to Lane informing him that the $250 million loss he claimed on his 2000 tax return was disallowed and that he was obligated to pay back taxes, interest and a penalty. Lane settled with the IRS in December 2013 and filed this action against defendants on January 3, 2014.

¶ 14 With respect to BDO Seidman, Lane alleged breach of fiduciary duty, fraud, and civil conspiracy. Lane further alleged that Deutsche Bank aided and abetted BDO Seidman's breach of fiduciary duty and fraud and also participated with BDO Seidman in a civil conspiracy. The circuit court granted defendants' motion to dismiss the complaint on the ground that it was time-barred, and Lane timely appeals.

¶ 15                                                    ANALYSIS

¶ 16 Plaintiff's sole contention on appeal is that the circuit court erred in dismissing his claims as untimely pursuant to section 2-619(a)(5) of the Code of Civil Procedure. 735 ILCS 5/2-619(a)(5) (West 2014). A motion to dismiss under section 2-619 admits the legal sufficiency of the plaintiff's complaint, but asserts an affirmative defense or other matter that defeats the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. We accept as true all well-pleaded facts in the plaintiff's complaint and draw reasonable inferences from those facts in favor of the plaintiff as the nonmoving party. *Chicago Title Insurance Co. v. Teachers' Retirement System*, 2014 IL App (1st) 131452, ¶ 13. Our review of a dismissal order under section 2-619 is *de novo*. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006).

¶ 17 We begin by setting forth the statutes of limitation applicable to Lane's claims against Deutsche Bank and BDO Seidman. Lane's claims against Deutsche Bank, as "civil actions not otherwise provided for," were required to be brought "within 5 years next after the cause of action accrued." 735 ILCS 5/13-205 (West 2014). And Lane's causes of action against BDO Seidman, a public accounting firm, are subject to a two-year statute of limitations, beginning from the time plaintiff "knew or should reasonably have known" of BDO Seidman's acts or omissions in performing professional services. 735 ILCS 5/13-214.2(a) (West 2014).

¶ 18 As is apparent, the statutes differ not only in their length, but in their start dates. Section 13-205 provides that the limitations period commences when the cause of action "accrues," or when "facts exist that authorize the bringing of a cause of action." *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 20. A tort cause of action, for example, accrues when the elements of duty, breach, causation, and injury are present. *Id.*; see also *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995) (tort causes of action generally accrue when plaintiff suffers injury). Section 13-214.2(a), on the other hand, implicates the so-called "discovery rule," postponing the start of the limitations period until plaintiff knows or reasonably should know that he was injured and that his injury was wrongfully caused. *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 672-73 (1997).[1]

---

[1]This is not to say that claims subject to the limitations period under section 13-205 may never receive the benefit of the discovery rule. To the contrary, the rule may be invoked to mitigate the potentially harsh results of a mechanical application of the five-year limitations period (*Khan*, 2012 IL 112219, ¶ 20), but in contrast to section 13-214.2, the rule is not built into the statute.

¶ 19    Resolution of the timeliness issue thus requires us to determine both when Lane's claims accrued (when Lane was injured) and when they were discovered (when Lane was on notice of his injury). Lane argues that his claims accrued on January 31, 2013, with the IRS's issuance of the notice of deficiency, and prior to that time there was no cause of action for him to discover. In other words, he maintains that the date of accrual was concurrent with the date of discovery. For this proposition, Lane relies almost exclusively on our supreme court's decision in *Khan*, 2012 IL 112219.

¶ 20    In *Khan*, plaintiffs paid defendants $1 million in 1999 and 2000 to participate in tax shelters they later discovered were illegitimate. *Id.* ¶ 23. The IRS began auditing plaintiffs' 1999 and 2000 tax returns in May 2003, but plaintiffs did not file suit against defendants until nearly 10 years later, in 2009, after receiving a notice of deficiency from the IRS. *Id.* ¶¶ 1-3, 27. Plaintiffs argued that the discovery rule tolled the statute where defendants affirmatively misled them as to the legality of the tax shelter strategies. *Id.* ¶¶ 24-25. Specifically, plaintiffs alleged that defendants provided them with opinion letters from a purportedly independent law firm which stated that the IRS Notice 2000-44 was " 'more likely than not legally inapplicable' " to the tax shelter strategies in which plaintiffs had participated. *Id.* ¶ 25. Moreover, plaintiffs alleged that defendants advised them not to participate in the IRS's 2000 amnesty program. *Id.* ¶¶ 25-26. Defendants responded that the statute began to run in 1999 or 2000 with plaintiffs' $1 million fee payment or, at the latest, by May 2003, when plaintiffs hired independent counsel to represent them in the IRS audit. *Id.* ¶¶ 23, 27.

¶ 21    The supreme court agreed with defendants that "a portion" of plaintiffs' injuries occurred in 1999 and 2000 with the payment of the $1 million fee, but held that plaintiffs could not have known their injuries were wrongfully caused at that time due to defendants' acts of concealment. *Id.* ¶¶ 25-26. The court went on to grapple with and reject the May 2003 start date, stating: "As of May 2003, no injury had occurred. Plaintiffs had filed their tax returns and claimed tax losses based on the options transactions. At that point, they had received the promised tax benefits. Further, plaintiffs alleged in their complaint that they had been assured by some of the alleged coconspirators that the IRS notices did not apply to them." *Id.* ¶ 42. Again, the court held that because defendants concealed the negative tax consequences of participating in the shelters–*i.e.*, the other "portion" of plaintiffs' injury–the statute remained tolled as of May 2003. See *id.* Ultimately, the court concluded that plaintiffs could not have discovered that their injuries were wrongfully caused until the IRS served them with a notice of deficiency. *Id.* ¶ 45.

¶ 22    Lane reads *Khan* as setting forth a bright-line rule that any cause of action by a taxpayer suing as a result of a deficiency notice accrues when the taxpayer receives the notice of deficiency. Not so: the court in *Khan* did not consider when plaintiffs' cause of action *accrued*, but when it was *discovered*. *Id.* ("[T]he discovery rule applies in this case."). Indeed, the supreme court did not hold that plaintiffs' injury first occurred with the receipt of the deficiency notice, but that the deficiency notice put them *on notice* of an injury and its wrongful cause. *Id.* And although the supreme court did not specify when plaintiffs' causes of action accrued, it can be inferred that accrual occurred sometime before receipt of the notice of deficiency. Were it otherwise, plaintiffs would not have required the benefit of the discovery rule, because without accrual of the cause of action, there was nothing for plaintiffs to discover prior to receipt of the notice of deficiency. See *id.* ¶ 41 (quoting *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 22 (2006)).

¶ 23    Since we determine that *Khan* did not set forth a bright-line rule for statute of limitations purposes, we turn to a fact-specific analysis of Lane's claims to determine both the date of accrual and the date of discovery. See *Hermitage Corp.*, 166 Ill. 2d at 78 (discovery rule applies on case-by-case basis). With regard to the date of accrual, Lane's claims of fraud, breach of fiduciary duty, and civil conspiracy are all premised on the same general allegations–namely, that defendants knowingly misrepresented the legitimacy of the POPS shelter, which induced Lane to pay "substantial fees" and resulted in tax penalties and disallowance of tax deductions. There is no dispute that these knowing misrepresentations of fact and breaches of duty occurred in 2000, when defendants worked to convince Lane to invest in POPS. "A portion" of Lane's injury also occurred at this time, when he invested $18 million to participate in POPS only to later learn the investment constituted a total loss. See *Khan*, 2012 IL 112219, ¶¶ 25-26 (holding that plaintiffs were injured upon payment of $1 million fee to defendants to participate in tax shelter later disallowed by IRS).

¶ 24    To be sure, Lane's tax-related injuries did not occur until years later, but Lane was not required to know the "full extent" of his injury before the statute of limitations was triggered. *Id.* ¶ 22 (quoting *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364 (1995)). Instead, the statute begins to run "when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries." *Golla*, 167 Ill. 2d at 364. Thus, Lane's causes of action accrued in 2000 or 2001, when he learned that his $18 million investment was lost.

¶ 25    We turn then to the second part of the analysis, that is, when Lane should have known this loss was wrongfully caused. Ordinarily, the trier of fact is in the best position to determine when a plaintiff knew or should have known of his injury and its wrongful cause, but when the facts are undisputed and only one conclusion emanates from those facts, we may decide this question as a matter of law. *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981).

¶ 26    Lane, just as the plaintiffs in *Khan*, was not immediately aware that his $18 million loss was an injury wrongfully caused. Indeed, he too alleged in his complaint that defendants concealed his injury by informing him in 2002 that the IRS offer of amnesty to those who participated in illegal tax shelters did not apply to POPS participants. But unlike the *Khan* plaintiffs, events occurring after this act of concealment were sufficient to put Lane on notice of his injury and its wrongful cause.

¶ 27    First, Lane's participation in the BDO Seidman summons litigation made him aware of the contents of the Kerekes memorandum in 2004, which in turn put him on notice that contrary to what Kerekes told him in 2002, Kerekes believed POPS was among the shelters the IRS deemed illegitimate. Then, in 2005, Lane learned that Vanadium Partners, the entity through which Lane's losses flowed, was being audited. Finally, and most importantly, on September 11, 2008, Peter Cinquegrani, the attorney who had prepared the letter to Lane opining on the legality of the POPS strategy, pled guilty to defrauding the IRS by authoring false opinion letters and entering into a phony consulting agreement with other tax shelter promoters. Cinquegrani's conviction, as a matter of public record, was sufficient to put Lane on notice that his $18 million loss was wrongfully caused. See *Diotallevi v. Diotallevi*, 2013 IL App (2d) 111297, ¶ 35 (where facts giving rise to claim were matters of public record, plaintiff knew or should have known injury was wrongfully caused). In other words, by September 2008, Lane was "under an obligation to inquire further to determine whether an actionable wrong was committed." *Nolan*, 85 Ill. 2d at 171. The fact that the IRS did not issue the deficiency notice to

Lane until January 2013 simply means that the full extent of Lane's injuries did not become apparent until that time. But this does not alter our conclusion that the fact of Lane's injury and the likelihood that it was wrongfully caused were or should have been apparent to Lane, at the latest, by 2008.

¶ 28 In sum, we hold that Lane's causes of action against defendants accrued in 2000 or 2001, and he knew or should have known that his injury was wrongfully caused by September 2008. Thus, his January 2014 complaint was filed beyond both the five-year statute of limitation applicable to Deutsche Bank and the two-year statute applicable to BDO Seidman.

¶ 29                                           CONCLUSION

¶ 30 For the reasons stated, we affirm the circuit court's order dismissing Lane's complaint as time-barred.

¶ 31 Affirmed.