2019 IL App (1st) 181113-U

No. 1-18-1113

Third Division
December 11, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| LESTER G. DETTERBECK III, WENDI GAWNE f/k/a Wendi Jensen, and BRUCE DETTERBECK, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | No. 16 CH 02260 |
| v. | ) ) ) | Honorable Thomas R. Allen, Judge, presiding. |
| JOHN DETTERBECK, BARBARA DETTERBECK, LESTER DETTERBECK ENTERPRISES, LTD., CARRIE TRUST GROUP PARTNERSHIP; LORRAINE TRUST GROUP PARTNERSHIP; ESTATE OF LESTER G. DETTERBECK, JR.; the LESTER G. DETTERBECK, JR. REVOCABLE TRUST DATED MAY 2, 2005; and LEAF, DAHL & COMPANY, LTD., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Ellis and Justice Howse concurred in the judgment.

**O R D E R**

¶ 1     *Held*:   The circuit court properly found that plaintiffs were reasonably apprised of harms stemming from alleged breaches of fiduciary duty in 1986 and there was no tolling of the statute of limitations as to causes of action accruing more than five years prior to the filing of plaintiffs' complaint and dismissal was proper. However, causes of action accruing within the preceding five years were improperly dismissed wholesale. In claims against the original trustee, *laches* is applicable to dismiss plaintiffs' claims due to the death of key witnesses. Claims against the successor trustees based on accountability for actions of the former trustee, were also properly dismissed, but successor trustees are separately liable for any additional breaches and such claims cannot be dismissed under the statute of limitations or *laches*. Lastly, claims of professional negligence were improperly dismissed under section 2-615 where plaintiffs sufficiently plead their cause of action.

¶ 2     Plaintiffs, Lester G. Detterbeck III, Wendi Gawne, and Bruce Detterbeck, are three out of the four beneficiaries under two sets of trusts who brought suit against the current co-trustees, their youngest brother John Detterbeck and their stepmother Barbara Detterbeck. Plaintiffs also named as defendants: the estate of their father and former trustee, Lester Detterbeck, Jr.; the accounting firm who worked with the trustees, Leaf, Dahl & Company; a family company currently run by John, Lester Detterbeck Enterprises[1] (LDE); and the partnerships formed to hold the trusts' assets, Carrie Trust Group and Lorraine Trust Group. The fourth amended complaint lodged eight counts in total against the defendants including alleged breaches of fiduciary duty, civil conspiracy, aiding and abetting, unjust enrichment, and professional negligence. Plaintiffs now appeal the circuit court's April 17, 2018 order dismissing the count of professional negligence against Leaf, Dahl, & Company under section 2-615 of the Illinois Code of Civil Procedure (the Code), 735 ILCS 5/2-615 (West 2018), and the circuit court's April 30, 2018 order dismissing the remaining counts under section 2-619 of the Code, 735 ILCS 5/2-619 (West 2018).

¶ 3                                                 I. BACKGROUND

---

[1]Lester Detterbeck Enterprises (LDE) was formerly known as Form-Rite Tools Inc. until the late 1980s.

¶ 4                                            A. The Trusts[2]

¶ 5        In 1973, plaintiffs, defendant John, and their sister Cheryl Martin[3] were named as the primary beneficiaries of the Carrie Cederna Trusts 1, 2, 3, 4, and 5. Carrie Cederna, the beneficiaries' maternal grandmother, named the beneficiaries' father, Lester Jr., as the trustee. Each trust was intended to be "separate and distinct" from the others and was funded with $100. In 1978, Lester Detterbeck, Sr., executed a nearly identical trust agreement on behalf of plaintiffs, John, and Cheryl under the Lorraine Trusts 1, 2, 3, 4, and 5. The agreements differed only in the names of the grantors, the date and place of execution, and the named back-up trustee who would act if no other Trustee was qualified to act.

¶ 6        The trust agreements provided that distributions to the beneficiaries would be made at the "sole discretion of the Trustee." The Trustee was empowered, *inter alia*, to "hold, manage, improve, repair and control all property, real or personal" in the trust estate; to "sell *** grant options to purchase, and to convey or exchange any and all of the property"; to "lease any tangible personal property"; to "borrow money, to extend or renew any existing indebtedness, and to mortgage or pledge any property"; to "abandon any property *** deem[ed] worthless or not of sufficient value to warrant keeping or protecting"; and to "lend the principal or income of the Trust estate to the beneficiary, without interest and without security, or to make loans to such other persons, partnerships, corporations, trusts or estates, upon such terms with such security and rates of interests as the Trustee may deem advisable." Lester Jr. managed the trusts from their creation up to his death. In 2008, he appointed his son John and his second wife, Barbara, as successor co-trustees on both trusts. Lester Jr. died

_____

[2]These background facts were ascertained from the exhibits attached to the complaint and motions to dismiss.

[3]Cheryl Martin passed away and her beneficiary shares were reallocated evenly among her four siblings in accordance with the terms of the trust agreements.

on August 24, 2015, and shortly after John and Barbara accepted their appointments as co-trustees.

¶ 7        Lester Jr. was also the owner of LDE, the family-run company, which manufactures cutting tools, cams, tool holders and replacement parts for the precision machine products industry. The company is situated in Iron River, Michigan and run by John who was named president in 1999. John obtained 100% ownership of the company after Lester Jr. died. Plaintiffs had all worked at LDE at some point in time, in various capacities, and for different durations. John testified via deposition regarding the relationship between the trusts and LDE.

¶ 8        John stated that in the months following his father's death, he went through all the records available in order to facilitate the transitioning of the company and trusts. During his review of the relevant documents, John found that each of the separate trusts did not have individual bank accounts. Instead there were bank accounts for the Lorraine Trust Group and the Carrie Trust Group. Although John could not find any specific agreements, he and Barbara acted under legal advice to execute an "Amended and Restated Partnership Agreement" for the Carrie Cederna Trusts and the Lorraine Trusts. The agreements were signed on December 12, 2015, and purported to be continuations of the original partnership agreements which could not be located. The partnership agreements joined the Carrie Cederna Trusts 1, 2, 3, 4, and 5 into the Carrie Trust Group and the Lorraine Trusts 1, 2, 3, 4, and 5 into the Lorraine Trust Group. The restated partnership agreements invoked the Revised Uniform Partnership Act of the State of Florida and listed a Florida address for their principal office. Each partnership group stated its purpose was "to invest and reinvest,

acquire, hold, maintain, lease, sell and exchange equipment, with the lessee of such equipment being Lester Detterbeck Enterprises, Ltd."

¶ 9 John also found his father's handwritten notes on rates and amounts referencing equipment that was owned by the trust partnerships and leased to LDE. Having worked at LDE, John was familiar with the equipment at issue, but had never gone over the leases with his father. John attempted to compile the information from his father's notes into an electronic document. The tabulations he compiled were submitted as deposition exhibits. As far as he knew, there were no written leases detailing the contracts between the trust partnerships and LDE.

¶ 10 After their father's memorial, John received emails from Lester III regarding the trusts. The first email requested copies of the original trust documents together with the recent tax returns and financial statements in order to get "full transparency on the two trusts." Lester noted that "now that our father's ashes have been buried, it's time to deal with the '800 pound gorilla in the room'" in order to ensure that the purpose of the trusts have been and will continue to be met. After receiving some documents from John, Lester emailed again, asking to work together on the trusts. Lester referenced letters he had sent to their father in 1985 and 1986 about the management of the trusts and communication between the family members. Lester noted, "I think we all gave him a 'pass' on what we knew should[*sic*] have received for decades and now that he has passed, we're all ready to be brought up to date as quickly as possible." Lester ended the email with a suggestion to "wind [the trusts] down" something he noted he had also suggested 30 years prior.

¶ 11 The letters, penned by Lester III and referenced in his emails to John, were annotated as copied to all siblings and their mother. The 1985 letter specified Lester was writing his father

after reviewing the divorce[4] judgment, in which the judge ruled on whether the trusts were marital property. Lester III wrote "to give [his] opinion on the outcome." He stated that he had "no problem" with the judge's ruling provided that his father operate and handle the trusts "in a fiduciary manner for the benefit of the beneficiaries." The letter continued, "[i]f on the other hand, the trusts will be operated as they have in the past or if they are systemically dissolved back into Form-Rite or some other entity of yours, I think that mother and all of your children have 'been screwed.'"

¶ 12    The 1985 letter demanded that their father share information about the content of the trusts, the present investments, the rights and responsibilities of the trustee and beneficiaries, contemplated distributions, and provisions regarding securing loans from the trusts with all the beneficiaries. Lester III concluded the letter by laying out what he viewed as his father's two choices, to either manage the trusts in a way "that could benefit you and your loved ones" or "you take it all for yourself and turn your back on everyone."

¶ 13    The 1986 letter acknowledged that no response had been received over the last year. However, Lester III noted that certain events had compelled him to write once more "to try, for the final time, to convince you" to change the future. Lester III noted that his father had "continued [his] previous course of action" with regard to the trusts. The letter then discussed what Lester III understood were his legal rights. First, that the beneficiaries were entitled to "regular reporting, full disclosure, and objective and fiduciary handling of the trust funds" which his father had "cavalierly chosen not to." Second, that there was the possibility of suing to remove his father as trustee and although he believed he had a "strong case" to do

_____

[4]Lester Detterbeck, Jr. and Corrine Detterbeck were divorced in March 1985, in the Lake County Circuit Court Case No. 83 D 877. Although transcripts and orders from these proceedings were included in the record, we find that the divorce case is not relevant to the issues at hand.

so, he acknowledged that proceeding with legal action would add "additional pressure" on the "already strained relationships."

¶ 14 Lester III further accused his father of "continu[ing] to treat the [trust] funds as entirely yours, using them for your personal benefit" despite the divorce decree declaring the funds as property of the beneficiaries rather than either parent. He also wrote, "If you sincerely believe that the entire trust funds are all yours, then you are legally incorrect and morally dishonorable to your family." Lester III specifically named Dave Dahl, stating that Lester Jr. could change the course of the future by instructing Dahl to "undo what he helped you create" in order to "restore our family financial integrity." Thus, Lester III requested that his father set in motion a plan to close the trusts, distribute the funds, and "eliminate the trust charade."

¶ 15 B. Procedural History

¶ 16 On December 9, 2015, plaintiffs each invoked the terms of the trust agreement, executing powers of appointment and requesting the distribution of their respective trusts. On January 20, 2016, plaintiffs also issued a demand for a complete accounting of the trusts. Lester III stated that he was only allowed to review the 2012, 2013, and 2014 trust tax records rather than a full accounting. However, even his limited review caused him concern and as a result, plaintiffs filed their initial complaint on February 17, 2016.

¶ 17 1. The Complaint

¶ 18 The complaint was amended four times to re-plead counts that were dismissed, add additional defendants and claims, and address other issues that arose during the proceedings. Defendants, John and Barbara, filed a counterclaim for declaratory judgment regarding the sale of equipment held by the trust partnerships. This counterclaim was later resolved via

agreed order after depositions were taken. Plaintiffs' fourth amended complaint includes allegations that the counterclaim was improperly filed, as it was funded by the trusts' assets, and brought in bad faith.

¶ 19      The fourth amended complaint alleged, *inter alia*, that the trusts and their assets were wrongfully utilized and manipulated in order to fund LDE without adequate compensation to the detriment of the trusts and the beneficiaries' interests. Specifically, plaintiffs complained Lester Jr. had (1) arranged unreasonable oral leases of equipment owned by the Trusts, through the partnerships, to LDE at below-market rates; (2) generated unnecessary loans between the Trusts and LDE at lopsided interest rates favoring LDE; (3) removed and converted Trust assets for personal use; and (4) failed to provide proper accounting or keep standard books and records. Plaintiffs further alleged that John and Barbara failed to rectify the misdeeds perpetrated by Lester Jr., choosing instead to perpetuate the pattern of self-dealing and lack of communication and transparency. Specifically, John and Barbara were accused of wrongfully abandoning assets of the trusts, allowing LDE to convert such assets, and manipulating the books and records to provide inappropriate leases to LDE. John was also accused of removing assets from the trusts for personal use and both co-trustees are alleged to have negotiated in bad faith regarding the liquidation of trust assets and winding down of the trusts.

¶ 20      Lastly, plaintiffs brought separate claims against Leaf, Dahl & Company alleging that it knowingly collaborated with the trustees to prepare inaccurate general ledgers and manipulate the asset records, financial statements, and tax returns which omitted cash flows and footnote disclosures. Plaintiffs maintain that Leaf, Dahl & Company's actions aided and

abetted the trustees' misconduct and also constituted professional negligence because such actions fell short of the reasonable standard of care.

¶ 21                                    2. Motion to Dismiss

¶ 22        John, Barbara, and LDE filed a motion to dismiss ("LDE's motion") arguing that plaintiffs' allegations failed to state cognizable claims where: the trustee's actions were expressly authorized by the trust documents; bringing a declaratory judgment action did not constitute a breach of fiduciary duty; conspiracy between principals and agents of a corporation or family group is legally impossible; no allegations were made as to what the conspiracy entailed; damages stemming from a conspiracy did not exist; and there is no recourse for unjust enrichment if an express contract governs.

¶ 23        Furthermore, LDE's motion asserted that plaintiffs' claims were barred by the statute of limitations, *laches*, collateral estoppel and *res judicata*. The motion maintained that plaintiffs had received benefits under the Trust Agreements and Partnerships for more than 30 years, all the while aware of their ability to bring a suit against Lester Jr. However, plaintiffs delayed raising their claims, until their father's passing, which clearly fell outside of the limitations period. This delay caused the exact prejudice to John and Barbara that the rule of *laches* aims to prevent, given that Lester Jr. is no longer alive to defend his actions and such burden now falls on the successor trustees. John, Barbara, and LDE further maintained that claims on the propriety of transactions made between the Trusts and LDE were previously ruled on, as were claims relating to the declaratory judgment, thus such matters were barred by collateral estoppel and *res judicata*.

¶ 24        Leaf, Dahl & Company also filed a motion to dismiss ("Leaf's motion"). Leaf's motion incorporated similar arguments from LDE's motion on statute of limitations grounds and also

argued that plaintiffs' complaint failed to allege any active, substantial, and knowing assistance from the company to state a claim of aiding and abetting. Leaf, Dahl & Company asserted that it provided only routine accounting services, including preparing compilation reports and filing tax returns, and it was not involved in the loans and leases complained of as unfair and one-sided. Furthermore, Leaf, Dahl & Company asserted that it did not owe plaintiffs a professional duty under the Illinois Public Accounting Act and controlling case law, therefore it could not be sued for professional negligence. Thus, dismissal of both claims was appropriate under section 2-615 or 2-619(a)(9). Leaf, Dahl, & Company later moved to withdraw their combined motion to dismiss in order to avoid having to call a witness for deposition whose health was poor. Thus, Leaf, Dahl, & Company opted to proceed solely on their 2-615 motion to dismiss which argued that no professional duty was owed to plaintiffs.

¶ 25    On April 17, 2018, the circuit court heard arguments as to dismissal on the count of professional negligence and found in favor of Leaf, Dahl & Company as a matter of law. Plaintiffs argued that the law should recognize a trustee's primary intent in procuring accounting services is always for the benefit of third-party beneficiary of the trust. With that view, plaintiffs asserted that accountants are imputed with the knowledge that their services for the trustee are primarily for the benefit of the third-party beneficiaries. The court noted that imputing awareness of this primary intent to the accountant on the basis that the accountant has access to the trust documents, would "open a can of worms." The court found that plaintiffs had not pled, nor could they ever plead, facts sufficient to prove that Leaf, Dahl & Company owed a professional duty to plaintiffs who were third-parties to the accounting services contract.

¶ 26    On April 30, 2018, the remaining counts were presented to the circuit court on the pending motions to dismiss. The circuit court dismissed all counts with prejudice. The court found that the 1985 and 1986 letters, written by Lester III to Lester Jr., after judgment was entered in Lester Jr.'s divorce proceedings from his first wife, were contrary to plaintiffs' assertion that they did not discover issues with the trusts until after their father's death. Thus, the discovery rule did not apply and the allegations against the trustees were barred under the statute of limitations. The court also found that without the foundational tort or cause of action, the conspiracy and aiding and abetting charges must also be dismissed.

¶ 27    II. ANALYSIS

¶ 28    A. Breaches of Fiduciary Duty

¶ 29    Plaintiffs allege that Lester Jr., and later John and Barbara, engaged in multiple acts and courses of conduct occurring over decades which constituted breaches of their fiduciary duty. The circuit court dismissed all claims relating to a breach of fiduciary duty, without addressing the timeframe in which the alleged conduct occurred, finding that such claims were time-barred by the statute of limitations and dismissing all claims under section 2-619 of the Code.

¶ 30    A section 2-619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that defeat the claim. *Cohen v. McDonald's Corp.*, 347 Ill. App. 3d 627, 632 (2004). In reviewing the grant of a motion to dismiss under section 2-619, this court accepts as true the well-pled allegations of the plaintiff's complaint and the evidentiary facts in a defendant's supporting affidavit which have not been refuted in a counter-affidavit of the plaintiff. *Board of Managers of the Village Centre Condominium Association v. Wilmette Partners*, 198 Ill. 2d 132, 134 (2001);

*Kawaguchi v. Gainer*, 361 Ill. App. 3d 229, 236 (2005). A trial court's ruling on a 2-619 motion is reviewed *de novo*. *Martin v. Illinois Farmers Insurance*, 318 Ill. App. 3d 751, 757 (2000).

¶ 31    The long-standing principles of law provide that the duty of a fiduciary is to act with undivided loyalty and the utmost fidelity and recognizes that fiduciaries are held to the highest standard of care. See *Home Federal Savings & Loan Ass'n v. Zarkin*, 89 Ill. 2d 232 (1982). To state a claim for a breach of fiduciary duty, it must be alleged and ultimately established that: (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) such breach proximately caused the injury of which the party complains. *Lawlor v. North American Corp. of Illinois,* 2012 IL 112530, ¶ 69. There is no dispute that Lester Jr., John, and Barbara each assumed the role of a trustee and owed a fiduciary duty to plaintiffs. See 760 ILCS 65/1(1) (West 2018) (Under the Fiduciary Obligations Act, a "fiduciary" includes a trustee under any trust.) Although plaintiffs alleged numerous breaches and asserted that they suffered at least $50,000 in economic damages as a result of these breaches, we must deal with the initial question of whether plaintiffs' timing for filing this lawsuit caused them to forfeit their claims.

¶ 32    The statute of limitations for a breach of fiduciary duty claim is five years. 735 ILCS 5/13-205 (West 2016) (stating that civil actions without specified statute of limitations "shall be commenced within 5 years next after the cause of action accrued"). Under section 13-205 of the Code, the "limitations period commences when the cause of action 'accrues,' or when 'facts exist that authorize the bringing of the cause of action.'" *Lane v. Deutsche Bank AG,* 2015 IL App (1st) 142968, ¶ 18 (citing *Khan v. Deutsche Bank AG,* 2012 IL 112219, ¶ 20). See also *Diotallevi v. Diotallevi,* 2013 IL App (2d) 111297, ¶ 27 (noting that "a statute of

limitations begins to run as soon as a person suffers injury or, in the case of contract-based actions, at the time of the breach").

¶ 33        Plaintiffs filed this case on February 17, 2016. Customarily, the claims raised in the complaint should then be focused on causes of action accruing on or after February 17, 2011. However, plaintiffs argue for the application of the discovery rule and fraudulent concealment to toll the statute of limitations until 2015, when they state they first realized their injury.

¶ 34        Illinois recognizes a "discovery rule" which delays the commencement of the applicable limitations period until the plaintiff knew or reasonably should have known that he has been injured and that his injury was wrongfully caused. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995). The discovery rule will not operate to toll the statute of limitations where a plaintiff has enough information to apprise a reasonable person of the need for further inquiry to determine whether a legal wrong has been committed. See, *e.g.*, *Young v. McKiegue*, 303 Ill. App. 3d 380, 387-88 (1999) (discussing timeliness of bringing a wrongful death action). It is not necessary that a plaintiff know the full extent of his injury, but only enough to put him on notice of the need to investigate further. *Clay v. Kuhl*, 189 Ill. 2d 603, 611-12 (2000). Whether a plaintiff should have known of the need for inquiry is an objective determination to be made by the trier of fact. *Young*, 303 Ill. App. 3d at 387.

¶ 35        An otherwise untimely complaint, can also be saved from dismissal, "[i]f a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto," extending the time to bring suit for another five years "after the person entitled to bring the same discovers that he or she has such cause of action[.]" 735 ILCS

5/13-215 (West 2018). A plaintiff must plead facts alleging the fraudulent concealment statute in his complaint. *Hagney v. Lopeman*, 147 Ill. 2d 458, 469 (1992). For fraudulent concealment in the context of fiduciary relationship, "where a fiduciary has a duty to disclose certain facts to the plaintiff but fails to do so, the plaintiff's failure to use diligence to ascertain those facts is excused, and the statute of limitations begins to run when the plaintiff actually discovers the fraud." *Melko v. Dionisio*, 219 Ill. App. 3d 1048, 1061 (1991). However, the plaintiff must show that the relevant facts were in fact concealed. *Id.* at 1061-62. And "although the existence of a fiduciary relationship may excuse a plaintiff's failure to investigate diligently to ascertain facts that would put her on notice of a possible injury, there is plainly a difference between the failure to *ascertain* facts through diligent inquiry and the failure to *act upon* facts of which the plaintiff already has actual knowledge." *Id.* at 1062 (emphasis in original).

¶ 36                                1. Claims Against Lester Jr.

¶ 37                                a. Statute of Limitations

¶ 38        Plaintiffs first argue that the circuit court improperly relied on old letters to impute knowledge of their father's misconduct to them. Plaintiffs assert that the conduct at issue had not yet occurred in 1985 and 1986 and therefore it was improper to rely on these letters to bar litigation stemming from their father's subsequent actions. Furthermore, plaintiffs rely on the principle that a trust beneficiary has no affirmative duty to investigate the trustee especially where the trustee's failure to disclose information makes it difficult to discover the alleged misconduct.

¶ 39        Plaintiffs' complaint alleges, *inter alia*, that they have been denied a proper accounting for the trusts, from 1973 and 1978, respectively, through 2015. Upon being granted a limited

review of documents pertaining to the trusts records and assets in late 2015, plaintiffs claim that only then did they realize there were substantial missing or unaccounted for assets. Plaintiffs further alleged that they were unable to determine the extent of misuse and waste stemming from their father's general misuse of the trust assets. They noted a few specific examples of their father's actions including self-serving loan practices in 2012, risky leasing practices in 2014, and allegations of knowingly accepting benefits from the trusts that were "wrongful."

¶ 40    Nonetheless, Lester's own words, in his letters to his father in 1985 and 1986, overwhelm any claim that discovery of such injury was not possible until his review in 2015. Although plaintiffs express in their brief that, "[t]he only missteps [plaintiffs] knew about in 1985-86 was that Father had failed to provide accountings and kept poor records[,]" Lester III writes bluntly in 1986 addressing his father's lack of response to the first letter and states, "Certainly you have breached your powers and responsibilities as trustee." We recognize that many of the allegations of wrongdoing occurred after the letters were written, but find that plaintiffs cannot benefit from their willful ignorance of their father's loose practices in regards to the trusts' administration. It is clear that plaintiffs were aware something was amiss in their father's trust administration practices by the 1980s. These letters levy accusations of self-dealing, manipulation involving LDE—formerly known as Form-Rite, failure to provide an accounting, and misuse of the trust assets for personal gain. These accusations raised informally in 1985 and 1986 are closely related to the claims now brought regarding the self-serving loan practices, leases with LDE, and misuse of trust assets for personal gain. Although plaintiffs may not have had access to any documents to support their accusations in 1985 and 1986, it is objectively apparent that plaintiffs knew enough to be

reasonably apprised of the need for further inquiry. Accordingly, plaintiffs cannot now seek refuge in the doctrine of the discovery rule to justify the delay in filing their complaint.

¶ 41    Furthermore, plaintiffs have made claims of fraud, but they cannot rely on the fraudulent concealment statute. Plaintiffs assert that the circuit court's ruling perverts the long-established relationship between a trustee and a beneficiary, where a beneficiary should not be required to inquire into the trustee's actions. However, as the Appellate Court, Second District noted in *Melko*, a failure to act upon facts which a plaintiff already has actual knowledge is different from the failure to ascertain facts through diligent inquiry. *Melko*, 219 Ill. App. 3d at 1062. Plaintiffs cannot claim that their father's shortcomings in communication and accounting prevented them from knowing of the injury at all, where they made an informal demand on their father in the 1980s to redress what they perceived to be injuries stemming from his actions in administering the trust assets. We find that these letters cannot be read in any way, other than to corroborate the fact that plaintiffs had actual knowledge of some wrongs. Even if plaintiffs did not know the full extent of the harm, their decision to refrain from acting against their father for many years, until he died, prevents them from now challenging their father's actions, which are stale claims due to the statute of limitations.

¶ 42    Plaintiffs draw comparisons to a handful of cases where the time for filing suit has been extended. We will examine two in particular. In *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605 (2007), the plaintiffs were beneficiaries of a trust established in 1918 that held title to a parcel of land. They brought claims against the former trustee alleging that it had failed to exercise the trust's rights in transactions involving the property. *Id.* at 612-13. Over the years, the defendant signed off on transactions that involved

redeveloping the land parcel, transferring and amending leases, and assigning or guaranteeing rents and mortgage payments. *Id*. at 607-10. The plaintiffs inquired in 1992 and 1993 about the status of the land parcel and received responsive letters from the defendant and certain documents. *Id.* at 610. Later in 2000, the defendant filed a complaint for instructions. *Id.* During the pendency of that action, the plaintiffs repeatedly requested a copy of the guarantee providing the rights at issue in their subsequently raised breach of fiduciary duty action. *Id*. at 611. After settling the issues in the defendant's complaint for instructions, the plaintiffs were finally given a draft copy of the guarantee from the defendant's archives after the defendant conceded that the original had been lost. *Id.* The plaintiffs brought suit based on their reading of the guarantee. *Id*. at 612. The defendant argued that the plaintiffs' 2004 complaint was time barred because, in 1993, some of the documents relevant to the transactions challenged were turned over. *Id.* at 613. However, the court disagreed finding that the plaintiffs never received nor were otherwise aware of the contents of the guarantee creating the rights, that the defendant had allegedly failed to enforce, until February of 2004. *Id.* at 618-19. Therefore, the court denied the defendant's motion to dismiss because it could not say as a matter of law that the plaintiffs knew or should have known of their right to bring a fiduciary duty claim more than five years before they filed their complaint. *Id.*

¶ 43     Plaintiffs argue that the *Fuller* plaintiffs knew certain facts associated with their claim, but were unaware of the specific facts related to the guarantee's provisions, placing them in a situation similar to plaintiffs. However, unlike the *Fuller* plaintiffs, which the court found did not have "sufficient knowledge to apprise them of the breach of fiduciary duty claim," because they were unaware of the terms of the guarantee, plaintiffs here had sufficient knowledge to apprise them of their father's wrongdoing. Lester III even stated that he

believed he had a strong case for suing to remove his father as a trustee. To find that plaintiffs here were not reasonably apprised that a breach of fiduciary duty had occurred, where they were aware that they had been denied a proper accounting for many years, that their father was treating the trust assets as his own, and that they had the right to bring a lawsuit, would require that we turn a blind eye to the evidence.

¶ 44    In *Kurtz v. Soloman*, 275 Ill. App. 3d 643 (1995), a sister sued her brother for constructive trust and breach of fiduciary duty where she had given him $45,000, which she and her minor daughter had received as a family inheritance, to invest in stocks and real estate. The arrangement began in 1968 and continued through 1980, and was not supported by a written trust agreement. *Id*. at 646. The defendant-brother purportedly provided his sister with monthly statements up to the mid 1970's, although neither party maintained copies of the statements and only two from 1968 were presented at trial. *Id*. In 1980, the plaintiff-sister was informed by a friend that her brother was cheating her, and after she looked into the matter, her brother refused to give an accounting of the investments and she filed suit. *Id.* at 648. The trial court found that *laches* did not apply, despite the defendant's argument that during the time period of the complaint, the plaintiffs consistently benefitted from the defendant's efforts and the plaintiffs failed to object. *Id*. at 649, 654. The court found that because the defendant-brother had failed to keep his sister fully informed, the plaintiff-sister's failure to discover her claims was excused, and she did not discover the fraud until 1980 and her ensuing suit was timely filed. *Id*. at 654.

¶ 45    In *Kurtz*, the court cited the defendant's failure to keep his plaintiff-sister fully apprised of the investments as a reason for denying the application of *laches*. However, the plaintiff-sister's actions upon suspecting her brother's fraud included making a demand for an

accounting and bringing suit when that demand was unanswered. Here, plaintiffs made a demand for accounting on their father in 1985 and 1986. Although they received no response from their father, they failed to bring suit. Thus, plaintiffs' position in terms of the application of *laches* or the statute of limitations is opposite to the plaintiff in *Kurtz.*

¶ 46    Thus, we find that the time period to bring claims against Lester Jr. for actions prior to 2011 were not tolled and were properly dismissed. However, plaintiffs further assert that specific claims were alleged to have arisen out of actions occurring in 2011 or later which were improperly dismissed by the circuit court. We note that plaintiffs have not invoked the continuing violation rule which provides that the limitations period does not begin to run until the date of the last injury or the date the acts cease where a claim involves a continuing or repeated injury. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 345 (2002). In *Belleville Toyota*, our supreme court reviewed a dispute involving a series of allocations of vehicle deliveries between the manufacturer and the dealers under a supply agreement which occurred two to four times per month over a course of time. *Id.* at 343, 348. Although the dealers suffered a repeated injury, the trial court held that each allocation could be treated as separate violations, generating a separate and new cause of action. *Id.* at 348-49. Therefore, the court determined that the dealers could only maintain a cause of action for the particular allocations that occurred in the four years immediately preceding the filing of the complaint and dismissed the other charges. *Id.* at 349. Here, as plaintiffs do not claim one continuous violation, they may only maintain causes of actions for the particular actions their father took between 2011 and his death in 2015. Thus, to the extent that plaintiffs raise

specific claims against their father accruing in 2011 or later,[5] these were improperly dismissed on statute of limitations grounds.

¶ 47                                    b. *Laches*

¶ 48        Defendants argue that plaintiffs' claims are also barred by the doctrine of *laches*. Here, the circuit court did not address the issue of *laches*, finding that all claims were already barred on statute of limitations grounds. However, as we discussed above, only the pre-2011 claims were properly dismissed as untimely filed. Our review of dismissal is *de novo* and we are not limited by the reasons relied on by the circuit court for dismissal. Thus, we now examine the remaining claims for breach of fiduciary duty, as to Lester Jr., with *laches* in mind.

¶ 49        "*Laches* is an equitable principle which bars recovery by a litigant whose unreasonable delay in bringing an action for relief prejudices the rights of the other party." *People ex rel. Daley v. Strayhorn*, 121 Ill. 2d 470, 482 (1988). However, unlike a statute of limitations, "*laches* is not a mere matter of time but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in the condition or relation of the property and the parties." *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 51 (quoting *Holland v. Richards*, 4 Ill. 2d 570, 578 (1955)). For *laches* to bar a claim, "it must appear that a plaintiff's unreasonable delay in asserting his rights has prejudiced and misled the defendant, or caused him to pursue a course different from what he would have otherwise taken." *Richter*, 2016 IL 119518, ¶ 51 (quoting *People ex rel. Casey v.*

---

[5]Accrual after 2011 does not refer to any leases complained of which were entered into prior to 2011 but were continued past 2011; these causes of actions cannot be maintained and must be dismissed on statute of limitations grounds. See *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 279 (2003) ("where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury").

*Health & Hospitals Governing Comm'n of Illinois*, 69 Ill. 2d 108, 115 (1977)). The determination of whether laches applies depends on the facts and circumstances of each case. *Tully v. State*, 143 Ill. 2d 425, 432-33 (1991). Because it is an equitable doctrine, a court has discretion to determine whether *laches* applies in a particular case. *Finley v. Finley*, 81 Ill. 2d 317, 330 (1980).

¶ 50        Plaintiffs contend that *laches* is not applicable here because there is disagreement over whether the doctrine is suitable in actions seeking solely money damages. Plaintiffs further assert that even if *laches* was considered, there was no unreasonable delay because they did not discover the trustee's misconduct until recently, there is a presumption against using *laches* to shorten the statute of limitations, and there is no prejudice to defendants in this case even with the deaths of Lester Jr. and Dahl as there are other documents and witnesses that can be substituted for these unavailable witnesses.

¶ 51        Fiduciary duties arise as a matter of law from the relationship between the parties, not from documents. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 52. (citing *Armstrong v. Guigler*, 174 Ill. 2d 281, 287 (1996)). A claim for breach of fiduciary duty is not "founded on" a contract, even if the parties' relationship that gives rise to the fiduciary duty is based on a contract, rather, "[a] fiduciary duty is founded upon the substantive principles of agency, contract, and equity." *Id.* (citing *Armstrong*, 174 Ill. 2d at 293-94). Accordingly, we find that the equitable doctrine of *laches* is suitable here for addressing plaintiffs' breach of fiduciary duty claims which are founded in part in equity.

¶ 52        Plaintiffs threatened a lawsuit in 1986. They did not bring a suit until 2016—40 years later and approximately six months after Lester Jr. died and left the trusts' administration to John and Barbara. Plaintiffs asserted that they did not discover any of the trustee's

misconduct until after their father's death, an assertion we have already rejected because a reasonable person with plaintiffs' grievances in 1986 would have inquired further, monitored the situation closely, or taken further action rather than waiting 40 years to "discover" the wrongdoing. Although the pre-2011 claims have already been dismissed, and this *laches* defense is only considered as to the claims arising between 2011 and Lester Jr.'s death, the issues are undoubtedly related and this court would be hard-pressed to find that plaintiffs' inaction for 40 years does not constitute an unreasonable delay. The next question then is whether defendants were prejudiced by the delay. See *Tully*, 143 Ill. 2d at 432. ("The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party.")

¶ 53    Plaintiffs assert that the death of two witnesses—Lester Jr. and Dahl—should not be considered prejudice, because there are records and other witnesses available to testify as to the trusts' administration. We disagree. One of the salient issues with their father's administrative practices was the lack of written records and proper accounting. As John testified, many of the leases challenged were never formalized and even he, with full access to their father's records, had to reconstruct the terms of the lease from scrap papers with notes on certain figures and rates. Thus, the belated assertion of plaintiffs' claims has resulted in significant inequity to defendants who would be required to defend the nebulous practices of a man who has died on behalf of his estate and as successor trustees.

¶ 54    Moreover, it is unclear what changed between the family members after 1986, but it is apparent that all the beneficiaries enjoyed profits from the trusts as their father continued the business arrangements with LDE for a number of years. We cannot conclusively find that plaintiffs' inaction misled their father, or that he changed his position in reliance on their

inaction, but certainly the lack of follow through on their threats may have signaled to him that he did not have to change his practices. Had plaintiffs filed suit after receiving no response from their father in 1985 and 1986, they could have avoided the accumulation of damages over the years. Thus, we are reluctant to allow plaintiffs, who have knowingly slept on their rights, to now bring suit against their youngest brother and stepmother who are being held to answer, in lieu of their deceased father, for the alleged wrongs plaintiffs have suffered in the intervening time. As a result, we apply *laches* to deny the remainder of the claims alleging breaches of fiduciary duty by Lester Jr. and the related causes of action.

¶ 55                            2. Claims Against John and Barbara

¶ 56        Turning next to the allegations against the successor co-trustees, plaintiffs' complaint alleged, *inter alia*, that John and Barbara failed to rectify and continued to carry out breaches of fiduciary duty committed by Lester Jr., in addition to, misrepresenting information and refusing to negotiate in good faith with regards to winding-down the trusts.

¶ 57        Defendants cite section 14 of the Trust and Trustees Act, which provides that a successor trustee "is not liable for any act or failure to act of a predecessor trustee." 760 ILCS 5/14(2) (West 2016).[6] In applying this statute, it would be held as a matter of law that John and Barbara are not liable for Lester Jr.'s actions, such as the historical lack of a proper accounting. However, plaintiffs have also alleged that John and Barbara continued in the same manner and were additionally guilty of other breaches of fiduciary duty. Thus, we must consider whether the claims against John and Barbara, considering their actions separately from Lester Jr., were properly dismissed. See *Dick v. Peoples Mid-Illinois Corp.*, 242 Ill.

---

[6]This statute is scheduled to be repealed on January 1, 2020. However, its scheduled repeal does not affect this disposition and the statutory provision will be re-enacted under section 812 of the Illinois Trust Code, see 760 ILCS 3/812, pursuant to Public Act 101-48 (eff. Jan. 1, 2020).

App. 3d 297, 304 (1993) ("A successor trustee is, however, liable if he as well as the predecessor is guilty of a violation of duty to the beneficiaries.)

¶ 58    John and Barbara accepted their appointment as successor trustees in November 2015, with retroactive effect to the day after Lester Jr.'s death on August 24, 2015. Thus, any action taken by John and Barbara was inevitably within the statute of limitations period and improperly dismissed on statute of limitations grounds. Additionally, there was no unreasonable delay between the amended complaint and when John and Barbara's actions allegedly occurred. Thus, *laches* would not apply. The specific allegations against John and Barbara are primarily focused on three acts, (1) John removed $278,000 from the partnerships' brokerage accounts, (2) John and Barbara pursued a counterclaim in bad faith in order to force the sale of the remaining equipment at lower prices to the benefit of LDE and the detriment of the trusts' beneficiaries, and (3) John and Barbara wrote-off trusts' assets as abandoned giving the equipment to LDE for no consideration in December 2015.

¶ 59    First, plaintiffs acknowledge that the sum of money removed from the brokerage accounts was returned two months later; however, plaintiffs complain that no interest was paid on the sum. If viewed as a loan, rather than as an unauthorized removal, there can be no claim of breach here where the trust agreement authorizes "lend[ing] the principal or income of the Trust estate to the beneficiary, without interest and without security [.]" As John is also a beneficiary in addition to being the successor co-trustee, he is entitled to receive loans from the trusts at no interest.

¶ 60    Looking next at the sale of remaining assets, we note that the counterclaim was settled by agreed order. Defendants John and Barbara argue that the agreed order "operates to the same extent for purposes of *res judicata* as a judgment entered after contest, because it is

conclusive with respect to the matters settled by the order, judgment, or decree." See *Elliott v. LRSL Enterprise, Inc.*, 226 Ill. App. 3d 724, 728 (2d Dist. 1992). However, the Appellate Court, First District held in 2011 that an agreed order is not a judicial determination of the parties' right and does not act to preclude a plaintiff's claims under *res judicata. Currie v. Wisconsin Central, Ltd.*, 2011 IL App (1st) 103095, ¶ 29 (citing *Kandalepas v. Economou*, 269 Ill. App. 3d 245, 252 (1st Dist. 1994)). We choose to follow the First District's analysis in *Currie* and find that plaintiffs' claim challenging the sale of the remaining assets is not time-barred by the statute of limitations nor is it precluded by *res judicata*.

¶ 61     Lastly, because we accept as true the well-pled allegations of the plaintiffs' complaint we find that plaintiffs' claim as to the improper abandonment of trusts' assets in December 2015 cannot be dismissed. The allegations were raised without delay, within the statute of limitations, and have not been addressed by any other proceedings. Therefore, nothing precludes this cause of action from proceeding. However, the amended complaint still contains other allegations that are not specific as to when they occurred, and appear intertwined with the allegations against Lester Jr. We again emphasize that John and Barbara may only be held liable for any actions they took after accepting their appointment as co-trustees and reiterate that claims against Lester Jr. through his estate were properly dismissed.

¶ 62                                    B. Professional Negligence

¶ 63     Plaintiffs contend on appeal that the circuit court erred in dismissing count VII of the complaint under section 2-615 and finding that Leaf, Dahl & Company did not owe plaintiffs any professional duty as a matter of law.

¶ 64        A section 2-615 motion to dismiss attacks "the legal sufficiency of a complaint based on defects apparent on its face." *Pooh-bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). Such motion should only be granted if "it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." *Id*. When ruling on a section 2-615 motion, the court may consider only the "facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record." *Id*. The court must accept as "true all well-pleaded facts and all reasonable inferences that may be drawn from those facts." *Id*. We review an order granting a 2-615 motion to dismiss *de novo*. *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 54 (2011).

¶ 65        Under the Illinois Public Accounting Act, the general rule is that accountants—such as Leaf, Dahl & Company—cannot be found liable to third parties for civil damages stemming from their acts, omissions, decisions, and other conduct related to their professional services under contract. See 225 ILCS 450/30.1 (West 2018). However, liability will be imposed if the conduct constitutes fraud and intentional misrepresentation, or if the accountant "was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action[.]" 225 ILCS 450/30.1(1)-(2) (West 2018).

¶ 66        Plaintiffs contend that that Leaf, Dahl & Company knew its services were contracted by the trustees for the primary benefit of the trust beneficiaries. The question of whether a duty existed between a plaintiff and an accounting firm is a matter of law. *Kadlec v. Sumner*, 2013 IL App (1st) 122802, ¶ 20. We examine the complaint to determine if plaintiffs pled sufficient facts related to the primary intent rule.

¶ 67        Plaintiffs alleged that Leaf, Dahl & Company performed bookkeeping functions, accounting, tax, and other professional services for the trusts in addition to maintaining the

trusts and partnerships records, inventory schedules, and financial statements. Plaintiffs also asserted that Leaf, Dahl, & Company assisted Lester Jr. with the formation of the trusts and were aware that plaintiffs were among the designated beneficiaries. Plaintiffs also alleged that Leaf, Dahl, & Company were aware of the relationships between Lester Jr., John, and LDE, and assisted with the management of the leases between the trusts/partnerships and LDE.

¶ 68    The circuit court rejected plaintiffs' argument as a matter of law, finding that the language utilized in the creation of the trust could never impose a professional duty between any accountant for a trust and the trust beneficiaries because it is not the accountant's job to be familiar with the terms of the trust agreements. However, the court's ruling ignores that plaintiffs alleged specifically that Leaf, Dahl, & Company were familiar with the terms of the trust agreement and the parties for whom such arrangement was supposed to benefit. Under a 2-615 motion to dismiss standard, the court should have accepted plaintiffs' assertions as fact which would allow them to proceed with a professional negligence claim against Leaf, Dahl, & Company.

¶ 69    In *Freeman, Freeman, and Salzman, P.C. v. Lipper*, 349 Ill. App. 3d 677, 680-81 (2004), the plaintiffs alleged that they had discovered significant errors in the work done by an accounting firm, contracted by the company, to audit the company's annual financial statements and certify the value of each partner's capital account. 349 Ill. App. 3d at 681. The plaintiffs alleged that the accounting company knew plaintiffs would rely on the audit opinions to prepare their taxes and determine whether to continue investing in the company. *Id*. This court reversed the circuit court's dismissal under section 2-615 because the circuit court solely examined whether the plaintiffs sufficiently alleged that the accounting firm

owed a duty to the plaintiffs. *Id*. The court found that the circuit court should have examined whether the defendants were aware of their client's primary intent to benefit or influence the third-party plaintiffs. *Id*. The circuit court ruling at issue here, bears striking similarities to the case in *Freeman*. Here, the circuit court focused on whether a professional duty existed and found that a professional duty could never exist. However, the court should have focused on whether plaintiffs had plead facts making section 30.1 of the Illinois Public Accounting Act applicable to them.

¶ 70 Notably, two justices on the panel in *Freeman* wrote concurring opinions advocating for treating section 30.1 of the Illinois Public Accounting Act as an affirmative defense and placing the burden on the defendant to prove it was not aware of the client's primary intent to benefit or influence a third-party. See 349 Ill. App. 3d at 683-687 (Hoffman and Karnezis, JJ., specially concurring). See also *Builders Bank v. Barry Finkel and Associates*, 339 Ill. App 3d 1, 5-6 (2003) (reviewing motion to dismiss claim for accounting professional malpractice and negligent representation on basis of "affirmative matter" under section 30.1 of the Illinois Public Accounting Act). We agree that here, plaintiffs plead enough to survive a motion to dismiss under section 2-615 and the burden should have been shifted to Defendant Leaf, Dahl, & Company to prove that it was not aware of the trustee's primary intent.

¶ 71                                   III. CONCLUSION

¶ 72 For the reasons stated, we affirm in part and reverse in part.

¶ 73 Affirmed in part and reversed in part.